******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## MICHAEL HALPERIN *v.* RONDA HALPERIN
### (AC 40934)

Alvord, Elgo and Devlin, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed to this court from the postjudgment order of the trial court ordering him to include income derived from two entities, C Co. and I Co., in the calculation of his unallocated support obligation. Pursuant to a provision in the parties' separation agreement, which was incorporated into the dissolution judgment, the plaintiff was required to pay the defendant unallocated support, which was to be calculated using a decreasing percentage of the plaintiff's gross base income and quarterly bonuses over a twelve year schedule. That provision also provided that income for purposes of the calculation was the parties' respective total income that had "historically been listed" on line 22, or the equivalent, of their joint 1040 federal tax returns, and expressly included all employment, business and partnership income, but specifically excluded any income received by the plaintiff from patents or inventions that he created or obtained. Following the dissolution of the parties' marriage in 2010, the plaintiff acquired ownership interests in C Co. and I Co. Thereafter, the defendant filed an amended motion for contempt, arguing that the plaintiff had underpaid her unallocated support for the years 2010 through 2013. At the hearing on the motion, the central issue before the trial court was whether, pursuant to the unallocated support provision, income that the plaintiff had earned from C Co. and I Co. and similar future income was to be included in the calculation of the unallocated support. The trial court found that the provision was ambiguous and, crediting the defendant's testimony regarding the meaning of the phrase "historically been listed" as used in the provision, determined that the parties intended to include the income at issue in the plaintiff's total income for purposes of determining his unallocated support obligation. *Held* that the plaintiff could not prevail on his claim that the trial court improperly interpreted the subject provision of the separation agreement in determining that income received from C Co. and I Co. was included in the definition of total income for purposes of calculating the plaintiff's unallocated support obligation: that court's determination that the parties intended to include the income at issue in the plaintiff's total income for purposes of determining his unallocated support obligation was not clearly erroneous, as the term "historically," as used in the provision's income definition, modified "total income," which referenced income on line 22 of form 1040, total income under the provision expressly included all employment, business and partnership income, the plaintiff characterized his income from C Co. and I Co. as partnership income on his federal tax returns and the plaintiff recognized that his profits from C Co. were reflected on line 22 of form 1040, and the plaintiff's contention that the phrase "historically been listed" should be construed as referring only to how he had historically earned income as a physician was unavailing, as that construction would render the provision's specific exclusion of income derived from the plaintiff's patents and inventions superfluous; moreover, there was no merit to the plaintiff's argument that, because his interests in C Co. and I Co. were purchased with cash assets awarded to him at the time of the dissolution, the income received from his investment of the cash assets should not be redistributed again, as his argument confused an award of assets with a support award based on the income stream derived from an asset, and the cases relied on by the plaintiff were distinguishable from the present case; furthermore, this court was not persuaded by the plaintiff's argument that equitable principles required that his income from C Co. and I Co. be excluded from the calculation of unallocated support.

Argued November 13, 2019—officially released March 24, 2020

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New London at Norwich, where the court, *Boland, J.*, rendered judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the defendant filed a motion for contempt; subsequently, the court, *Carbonneau, J.*, issued an order regarding the plaintiff's unallocated support obligation, and the plaintiff appealed to this court. *Affirmed.*

*Cody A. Layton*, with whom, on the brief, was *Drzislav Coric*, for the appellant (plaintiff).

*Campbell D. Barrett*, with whom, on the brief, was *Johanna S. Katz*, for the appellee (defendant).

*Opinion*

ALVORD, J. In this marital dissolution action, the plaintiff, Michael Halperin, appeals from the trial court's postdissolution order resolving the motion for contempt filed by the defendant, Ronda Halperin. On appeal, the plaintiff claims that the court erred in interpreting the provision of the parties' separation agreement governing unallocated alimony and child support, namely, that income derived from certain investments made by the plaintiff is includable in his total income for purposes of determining his unallocated support obligation. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. The parties were divorced on March 11, 2010. The dissolution judgment incorporated by reference a separation agreement executed by the parties on the same date. Section 8 of the separation agreement[1] governs unallocated support and requires the plaintiff to pay to the defendant a decreasing percentage of his "gross base income" and "quarterly bonuses" over a twelve year schedule ending on March 11, 2022. Section 8 further provides: "Income for purposes of this calculation shall be the parties' respective 'total income' that has historically been listed on line 22 (or the equivalent) of their joint 1040 federal tax returns. This shall include all employment, business, partnership, consulting or real estate income, whether received in cash or not, but shall specifically exclude all interest, dividend and capital gains income realized from assets divided as part of the property distribution component of this dissolution [j]udgment and any income received by the plaintiff . . . as the result of patents or inventions which he has created and obtained. Capital losses, for whatever purpose, shall not serve as a reduction of a [party's] income. By way of example, if the numbers contained on the parties' joint 2008 [tax] return were used as part of his calculus, the plaintiff's unallocated support obligation would be based on $1,205,113.00 in income (the amount listed on line 22 ($1,216,295.00) plus capital loss ($3,000.00) minus interest $11,527.00) minus ordinary dividends ($2,655.00))."

Section 12 (a) of the separation agreement provides, inter alia, for the sale of certain real property owned by the parties. Under that provision, the plaintiff was entitled to the first $2,105,000 from any sale or sales in exchange for the defendant's receiving, at the time of the dissolution, certain other real property owned by the parties. After the first $2,105,000, the parties were to divide the remaining net proceeds of any sale or sales on an equal basis.

After preparing the separation agreement, the parties, both represented by counsel, appeared before the court, *Boland, J.* The plaintiff and the defendant were both canvassed by their counsel.[2] Following the individual

canvasses by counsel, the court sought clarification, "given the complexity of th[e] agreement." The following colloquy occurred:

"The Court: [A]s to the total income which is the basis for calculation of how much the plaintiff is going to pay to the defendant, I note that you specify line 22 on federal form 1040. I don't have that form in front of me. My recollection is that that line is distinct from the adjusted gross income line—which is around line 31 or something like that—and the difference between the two is the subtraction of certain items such as a taxpayer's contributions to a 401 (k) plan, cost of self-employed health insurance, and other items. Are you with me so far?

"[The Defendant's Counsel]: Yes.

"The Court: And so, I just want to clarify that the understanding of both parties is that those items are to be disregarded with respect to the alimony and child support payments. Correct?

"[The Plaintiff's Counsel]: That's the—that's your understanding?

"[The Plaintiff]: Yes.

"[The Plaintiff's Counsel]: I've explained that to you.

"The Court: Okay.

"[The Defendant's Counsel]: And that's your understanding as well, ma'am?

"[The Defendant]: Yes.

"The Court: And that's set forth in the agreement. The only reason that I raise it as an issue is that sometimes an agreement such as this will refer to adjusted gross income, and I wanted to make sure that this was deliberate and not accidental."

The court stated that it had examined the agreement, found it fair and equitable, and incorporated it into the divorce decree.

On February 26, 2014, the defendant filed a motion for contempt, arguing that the plaintiff had underpaid unallocated support for the years 2010 through 2012. On June 12, 2014, the defendant filed an amended motion for contempt, arguing that the plaintiff also had underpaid unallocated support for 2013. The parties appeared before the court, *Carbonneau, J.*, on June 20 and September 24, 2014. The central dispute as framed by counsel involved the interpretation of the term "historically" as used in § 8 of the separation agreement.[3] Specifically, following the dissolution of the parties' marriage, the plaintiff had acquired ownership interests in two entities, Constitution Surgery Center East (CSCE)[4] and International Spine and Orthopedic Institute (ISOI). The issue before the court was whether profits received from the plaintiff's ownership interest

in such entities were to be included in the unallocated support calculation. The parties filed briefs and reply briefs in December, 2014.

On December 19, 2014, the court sua sponte ordered the matter returned to court for "a further evidentiary hearing concerning latent ambiguities in the parties' [separation] agreement . . . ." Specifically, the court requested evidence regarding "whether the language of the [separation agreement] is plain and unambiguous and if the meaning is clear." On March 30 and August 28, 2015, the parties appeared before the court and offered testimony as to their understanding of the separation agreement provision at issue. The parties filed supplemental briefs on September 30, 2015, and the plaintiff filed a reply brief on October 7, 2015.

On January 20, 2016, the court issued a memorandum of decision. It found, in relevant part, as follows: "[The] plaintiff is a successful spine surgeon. He is inventive, innovative and entrepreneurial. [The] defendant is an attorney, but she does not now, and has not practiced law for some time. The court observed these parties to be highly educated, articulate, thoughtful and discerning individuals. . . . During the marriage [the] plaintiff created a 'TFAS' device to be implanted in a person's back. He received income from Globus Corporation for this implant, first through Norwich Orthopedic Group and later directly. He also received consulting income for teaching other doctors how to use and implant the device. . . . The parties declared income or losses from S corporations and partnerships during their marriage. [The] plaintiff continued to report such income after the marriage through 2013. . . . [The] defendant kept two real properties from the marital estate. To compensate [the] plaintiff for this, he received the first $2.1 million from the sale of other marital real estate. . . . [The] plaintiff placed these proceeds in a [new] Fidelity . . . account that he [opened after] the divorce. . . . He used a portion of this money to buy a house for $950,000. From February, 2011 to the end of 2013, he made several purchases totaling $558,488 from the Fidelity account to buy a 10.6222 [percent] interest in [CSCE] and a 1 [percent] interest in [ISOI]. . . . ISOI has yet to generate significant profit, but, in 2011, his interest in [CSCE] earned [the] plaintiff $2357; in 2012, $69,923; and in 2013, $425,467. . . . [The] plaintiff reported this income on '[s]chedule E' of his federal tax returns. . . . The [Internal Revenue Service (IRS)] provides different schedules to set out the details of different types of income. These schedules are appended to the standard 1040 form when required. Schedule B is used for taxable interest and ordinary dividends; [s]chedule C for business income or loss; [and] [s]chedule D for capital gain or loss. Schedule E is used to list supplemental income and loss from rental real estate, royalties, partnerships, S corporations, estates, trusts, and the like. . . . [The] plaintiff did not

include money he earned from [CSCE] or ISOI in this calculation of unallocated support owed to [the defendant] in 2012 or 2013 under the terms of the agreement." (Footnotes omitted.)

The court declined to find the plaintiff in contempt, on the basis that any noncompliance with the dissolution judgment was not wilful. Exercising its broad discretion to make whole a party who has suffered as a result of another party's failure to comply with a court order, however, the court ordered the plaintiff to include within the calculation of the defendant's unallocated support the income he earned and now earns from CSCE and ISOI and similar future income during the contracted support term.

The court addressed each of the plaintiff's arguments in turn. It first rejected the plaintiff's argument premised on fairness; see *Dan* v. *Dan*, 315 Conn. 1, 105 A.3d 118 (2014); as misplaced, stating that "[w]hile it might not be 'fair' for an ex-spouse to share in the former spouse's *postjudgment* income that the spouse did not in any way help create, that spouse should not be deprived of the benefit of an insightful *prejudgment* bargain even as it extends to such income." (Emphasis in original.) The court likewise disagreed with the plaintiff's argument that the separation agreement excludes from the unallocated support calculation any partnership income earned from CSCE and ISOI because his interests in those entities are a conversion of the assets he received in the dissolution property settlement. The court, noting that the plaintiff himself had characterized what he had received from CSCE and ISOI as "partnership income" on schedule E of his federal income tax returns, concluded that the income received from CSCE and ISOI is not a conversion of marital assets.[5]

Turning to the central issue, the court credited the defendant's testimony and explanation of the meaning of the phrase "historically been listed," which it found "was intended by the parties to fix in time the categories of income includable in the calculation of [the] plaintiff's unallocated support obligation to [the] defendant and their children." Specifically, the court accepted the defendant's explanation that income "correspond[ed] to the categories used by the IRS to make up line 22 of the 1040 form." In accepting this explanation, the court noted that "[f]uture changes in tax law or IRS Form 1040 could fundamentally alter the interpretation of the agreement [and] undo their intentions." The court rejected the plaintiff's construction of "historically been listed," which was that the term referred to "the specific sources and/or types of income," and "clearly show[ed] the parties looking backward in time, not forward, for sources and/or types [of income] to be included in the income calculation."

Lastly, the court determined that the defendant was entitled to statutory interest. Because the parties had

not submitted any evidence as to how the defendant would have used, invested, or conserved the funds owed to her, the court declined to specify a rate of interest. It instead ordered the parties to calculate an appropriate award of interest and to submit any resulting dispute to the court for determination, if necessary. Subsequently, the parties agreed to a 5 percent interest rate, and the court adopted the defendant's calculation of the unallocated support due to her from the plaintiff. This appeal followed.

On appeal, the plaintiff claims that the court improperly interpreted the separation agreement to determine that income received from CSCE and ISOI is includable within the definition of total income for purposes of calculating the plaintiff's unallocated support obligation. In support of this claim, the plaintiff argues that (1) the separation agreement unambiguously excludes income from CSCE and ISOI from the defendant's unallocated support, (2) the plaintiff's conversion of cash assets awarded at the time of dissolution to shares of a surgery center does not create income for purposes of calculating unallocated support, and (3) equitable principles require that the plaintiff's income from CSCE and ISOI be excluded from the unallocated support calculation.[6] We address each argument in turn.

The plaintiff argues that the separation agreement "is unambiguous to the extent income from CSCE and ISOI is excluded from [the] defendant's unallocated support." We disagree.

"It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. . . . When construing a contract, we seek to determine the intent of the parties from the language used interpreted *in the light of the situation of the parties and the circumstances connected with the transaction.* . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. . . .

"The threshold determination in the construction of a separation agreement, therefore, is whether, examining

the relevant provision in light of the context of the situation, the provision at issue is clear and unambiguous, which is a question of law over which our review is plenary. . . . Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . . The proper inquiry focuses on whether the agreement on its face is reasonably susceptible of more than one interpretation. . . . It must be noted, however, that the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Finally, in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Isham* v. *Isham*, 292 Conn. 170, 180–82, 972 A.2d 228 (2009).

In the present case, after initially declining to hear evidence regarding the parties' understanding of the disputed term, the court sua sponte opened the evidence to accept extrinsic evidence. It thereafter considered the extrinsic evidence, including the parties' testimony, in interpreting the separation agreement and made factual findings regarding the parties' intent. Thus, it is apparent that the court determined that the disputed provision was ambiguous, a conclusion with which we agree. Both parties offer plausible interpretations of the disputed provision. See, e.g., *Russell* v. *Russell*, 95 Conn. App. 219, 222–23, 895 A.2d 862 (2006) (parties' intent not clear and certain from language itself where parties used term "expenses . . . for completion" of son's treatment at medical facility and included another provision referencing payment of "all college expenses" of other son (internal quotation marks omitted)). Accordingly, the court properly considered extrinsic evidence to ascertain the intent of the parties as expressed in the language of the separation agreement.

Because we have determined that the relevant contract language is ambiguous, "[t]he determination of the intent of the parties to a contract . . . is a question of fact subject to review under the clearly erroneous standard. . . . This court has stated frequently that [a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed. . . . While conducting our review, we properly afford the court's findings a great deal of deference because it is in the unique [position] to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Citation omitted; internal quotation marks omitted.) *Bijur* v. *Bijur*, 79 Conn. App. 752, 761–62, 831 A.2d 824 (2003).

In construing the phrase "historically been listed," the court stated that the parties' predissolution tax returns showed income or losses from S corporations and partnerships. Because this income historically had been listed, it reasoned that future partnership income should be included in the unallocated support calculation, with the exception of certain categories of income the parties had specifically excluded from the definition of total income in the separation agreement. The court referenced the exclusion for "any income received by the plaintiff . . . as the result of patents or inventions which he has created and obtained." In the absence of this exclusion, the court found, postdissolution patent and invention income would be includable in the plaintiff's income for purposes of determining his unallocated support obligation. Additionally, the absence of an exclusion that would encompass the CSCE and ISOI income supported the determination that the parties intended such income to be included in the unallocated support calculation.

The court further found that the "parties purposely and specifically selected line 22 of IRS Form 1040 as a starting point for their definition of income," which finding is supported by the parties' responses to that effect during the canvass at the time of the dissolution. The court, recognizing that "[f]uture changes in tax law or IRS Form 1040 could fundamentally alter the interpretation of the agreement and undo their intentions," found that the phrases "historically been listed" and "or the equivalent" "both seek to fix the agreement's definition of income in time to make certain that their obligations and expectation of each other would not significantly change during the term of the agreement."[7]

Examining the parties' tax returns in evidence, the court noted that IRS Form 1040 contained "seventeen separate lines including alphabetical subdivisions (8a and 8b, for example) that precede line 22. Each line is for different categories of income, such as taxable and nontaxable interest (lines 8a and 8b), ordinary and qualified dividends (lines 9a and 9b), capital gain or loss (line 13). There is a separate line for business income or loss (line 12) and another for partnership income (line 17). Line 22 is the sum of lines 7 through 21. It represents the 'total income' of the filer from all sources listed by the IRS.

" 'Total income' in the operative sentence of the [separation] agreement refers to line 22. It is no coincidence that the exclusions from income in the parties' agreement correspond to specific earlier lines in the [IRS Form] 1040 like interest, capital gains and dividends. It makes no sense that [the] plaintiff would carve out these specific exclusions from his income—including future patents and inventions—and then rely on the broad and vague phrase 'historically been listed' to shield any other future income."[8] Accordingly, the court credited the defendant's testimony regarding the meaning of the phrase "historically been listed," which it found "was intended by the parties to fix in time the categories of income includable in the calculation of [the] plaintiff's unallocated support obligation to [the] defendant and their children."[9]

We conclude that the court's determination that the parties intended to include the income at issue in the plaintiff's total income for purposes of determining his unallocated support obligation is not clearly erroneous. "Historically," as used in the income definition modifies "total income," which references income on line 22 of IRS Form 1040. Further support for this conclusion is found in the inclusions and exclusions that immediately follow the disputed phrase. Notably, total income under the separation agreement expressly includes "*all* employment, business, [and] partnership . . . income . . . ." (Emphasis added.) As the trial court found, the plaintiff characterized his income from CSCE and ISOI as partnership income on schedule E of his federal tax returns, and the plaintiff himself recognizes that his profits from CSCE are reflected on line 22 of IRS Form 1040.

The plaintiff argues that "a fair reading of [§] 8 [of the separation agreement] as a whole requires that the income used to calculate [the] defendant's unallocated support under the agreement can only be viewed in a context that is retrospective." This retrospective view, according to the plaintiff, encompassed how "the plaintiff 'historically' earned money as a physician," i.e., his biweekly salary and quarterly bonuses. Total income under the agreement, however, expressly excludes "all interest, dividend and capital gains income realized from assets divided as part of the property distribution component of this dissolution [j]udgment and any income received by the plaintiff . . . as the result of patents or inventions which he has created and obtained." Were the plaintiff's construction of the disputed provision to be correct, namely, that the phrase "historically been listed" referred only to how the plaintiff had historically earned money as a physician, this exclusion would be superfluous. "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that ren-

ders a provision superfluous." (Internal quotation marks omitted.) *Isham* v. *Isham*, supra, 292 Conn. 182.

The plaintiff points to other provisions of § 8 of the separation agreement that he contends support his interpretation. First, he points to the statement that, "[h]istorically, the plaintiff has been paid by way of a weekly/biweekly draw and periodic bonuses." That language, however, is positioned within a paragraph discussing the timing and duration of the support payments. Specifically, the statement directly follows language stating that "[t]he plaintiff shall pay his obligation on a weekly or biweekly basis, via direct deposit," and immediately precedes language stating that "[t]he defendant shall be paid her percentage share of the plaintiff's gross income at the time the income is received by the plaintiff." Accordingly, we do not interpret this language as controlling the sources of income from which the support is calculated. Second, the plaintiff directs this court's attention to language in § 8 that provides for the plaintiff's payment of decreasing percentages of his "gross base income," "base bi-weekly gross income," "quarterly bonuses," and "quarterly gross bonuses." Although this language appears to focus on the plaintiff's earnings as a physician, we cannot conclude that it amends the parties' express definition of total income for purposes of determining his unallocated support obligation.

The plaintiff next argues that his interests in CSCE and ISOI were purchased using cash assets awarded to him at the time of the dissolution and, therefore, the income received from his investment of the cash assets "should not be redistributed yet again." In support of his argument, he cites *Gay* v. *Gay*, 266 Conn. 641, 835 A.2d 1 (2003), *Schorsch* v. *Schorsch*, 53 Conn. App. 378, 731 A.2d 330 (1999), and *Denley* v. *Denley*, 38 Conn. App. 349, 661 A.2d 628 (1995), a line of cases that he concedes is "factually distinguishable" but that he suggests evidences a "modern trend" in our courts of reluctance to "designate as income for purposes of support, funds received as a result of the conversion of assets awarded at the time of the dissolution." The defendant responds that "[t]he plaintiff's argument confuses an award of assets with a support award based on the income stream derived from an asset." We agree with the defendant.

An analysis of the cases relied on by the plaintiff leads us to conclude that the holdings in those cases are inapplicable here. The plaintiff cites *Schorsch* v. *Schorsch*, supra, 53 Conn. App. 380, in which the defendant sought a postdissolution modification of his alimony obligation. The issue on appeal was whether the trial court improperly had included in the calculation of the defendant's monthly income certain principal payments that he was receiving pursuant to a purchase money mortgage that he held on real property that had

been awarded to him in the dissolution decree. Id., 384. This court held that the trial court improperly included as income the *principal* portion of the mortgage payment generated from the sale because "[t]he mere exchange of an asset awarded as property in a dissolution decree, for cash, the liquid form of the asset, does not transform the property into income." (Internal quotation marks omitted.) Id., 385–86. The court in *Schorsch* addressed only the principal portion of the mortgage payments, which constituted the liquid form of the asset the defendant received in the dissolution decree, and the interest portion of the payments were not at issue.

In *Denley* v. *Denley*, supra, 38 Conn. App. 350, the plaintiff sought a postjudgment modification of alimony, arguing that, because he had lost an important client, his income had decreased substantially. The trial court concluded that the plaintiff had not met his burden of proving a substantial change in circumstances. Id. In determining whether the plaintiff's income had decreased substantially, the court included in income the profit that the plaintiff had received through the redemption of stock options that had been awarded to him as property in the dissolution decree. Id., 350, 353. On appeal, this court agreed with the plaintiff that, "because he was awarded the stock options as property in the dissolution decree, any money that he received from the exercise of those stock options was simply a conversion of an asset and should not have been considered income by the trial court for purposes of assessing whether there had been a substantial change in circumstances." Id., 353. This court concluded that the trial court should not have included the profit that the plaintiff generated by exercising his stock options in determining whether there had been a substantial change of circumstances because the exercise of the stock options resulted in a conversion of the asset to cash and did not transform the property into income. Id.

In *Gay* v. *Gay*, supra, 266 Conn. 642, our Supreme Court considered whether the trial court properly ordered a modification in alimony payments based in part on the court's determination that capital gains realized by the plaintiff from the sale of assets constituted income. Our Supreme Court concluded that "capital gains are not income for purposes of modification of an order for continuing financial support if those gains do not constitute a steady stream of revenue. This is true without regard to whether the assets from which those gains are derived were acquired before or after the dissolution." Id., 647–48. Underlying this conclusion was the court's recognition that, "[a]t least where, as is generally the case, capital gains do not represent a steady stream of revenue, the fact that a party has enjoyed such gains in a particular year does not provide a court with an adequate basis for assessing that party's long-term financial needs or resources." (Footnote

omitted.) Id., 647. It found persuasive Judge Schaller's reasoning expressed in his dissenting opinion in the Appellate Court, which stated that "a conversion of an asset from one form to another does not constitute the creation of income. Implicit in this conclusion is the underlying concept that the growth in value of the asset distributed at dissolution is not income when it is converted to another form. Rather, the growth, and resulting cash value when converted, simply represents the accrual in value of that asset itself. In other words, the category the item falls into, namely, either capital asset or income, does not change because the asset has appreciated in value and then is converted as a matter of form." (Internal quotation marks omitted.) Id.; see *Gay* v. *Gay*, 70 Conn. App. 772, 788–89, 800 A.2d 1231 (2002) (*Schaller, J.*, dissenting).

Each of the cases relied on by the plaintiff is distinguishable from the present case. *Schorsch* and *Denley* both involved the conversion of assets awarded in a dissolution to cash. In the present case, the defendant is not seeking a portion of the plaintiff's ownership interest in CSCE and ISOI but, rather, seeks a portion of the income stream generated by those ownership interests, which, pursuant to the terms of the separation agreement, is required to be included as total income for the purposes of calculating the plaintiff's unallocated support obligation. *Gay* is likewise inapplicable, given that it addressed the question of whether capital gains, which did not constitute a steady stream of revenue, constituted income for purposes of alimony modification. In the present case, the court properly found that the plaintiff's income received from CSCE and ISOI was not a conversion of marital assets and was not excluded from total income under the parties' separation agreement. In support of this conclusion, the court found that the income was "something more and different from the original asset, the 'converted' asset, interest, dividends or capital gains." We agree. Accordingly, the plaintiff's argument fails.

The plaintiff's final argument on appeal is one resting on equitable principles. He maintains that "the court should be mindful that the cash assets the plaintiff invested in CSCE are net, after tax, cash assets that he has from the property distributed to him as part of his marital dissolution property settlement and/or yearly postdissolution postdistribution property settlement (net, after tax, cash assets after he has made his required unallocated support payments)." He argues that the general risks accompanying investments "become compounded if [the] plaintiff is required to give part of his return to [the] defendant, especially if that is before he recoups his net, after tax, cash assets utilized in the investment." He also points to the separation agreement's provision that "[c]apital losses, for whatever purpose, shall not serve as a reduction of a parties' income," in support of his argument that it is "unques-

tionably unjust that [the] defendant could be allowed to sit back, completely insulated from any risk, and profit while [the] plaintiff is the only one who takes on any risk with his investments."

The plaintiff, recognizing that *Dan* v. *Dan*, supra, 315 Conn. 1, is distinct because it involves modification of alimony, nevertheless contends that the principles and logic of that decision apply. He points to language from *Dan* stating that, "when the *sole* change in circumstances is an increase in the income of the supporting spouse, and when the initial award was and continues to be sufficient to fulfill the intended purpose of that award, we can conceive of no reason why the supported spouse, whose marriage to the supporting spouse has ended and who no longer contributes anything to the supporting spouse's income earning efforts, should be entitled to share in an improved standard of living that is solely the result of the supporting spouse's efforts." (Emphasis in original.) Id., 14–15. Our Supreme Court held that, in the absence of certain exceptional circumstances, an increase in a supporting spouse's income, standing alone, will not justify the granting of a motion to modify an alimony award. Id., 4, 10.

The guidance of *Dan* is inapplicable. The present case does not involve a party seeking to modify an alimony award on the basis that the supporting spouse's income has increased. Rather, the question in the present case is whether the plaintiff's income from CSCE and ISOI is includable in the plaintiff's income for purposes of determining his unallocated support obligation pursuant to the terms of the separation agreement. Moreover, "[i]t is hornbook law that courts do not rewrite contracts for parties. . . . [A] court simply cannot disregard the words used by the parties or revise, add to, or create a new agreement." (Internal quotation marks omitted.) *Hammond* v. *Hammond*, 145 Conn. App. 607, 612–13, 76 A.3d 688 (2013). As the trial court stated in the present case, "[the] plaintiff may have been under a great deal of pressure to settle, and he may not now like the deal he struck with [the] defendant over [five] years ago, but she is entitled to the benefit of her bargain. The court cannot and will not undo or rewrite their agreement with the benefit of hindsight."

We conclude that the court properly determined that, pursuant to the separation agreement, the plaintiff's income received from CSCE and ISOI was required to be included in the plaintiff's total income for purposes of calculating his unallocated support obligation.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Section 8 of the separation agreement provides in relevant part: "Unallocated Support: The plaintiff husband shall pay the defendant wife unallocated support per the following:

• For the time period commencing on the date of Judgment and continuing until 8/11/12, the plaintiff shall pay the following:

   i. An amount equal to 38% of his gross base income in a manner as

defined infra.

    ii. An amount equivalent to 38% of his quarterly bonuses payable as described infra.

- For the time period commencing on 8/11/12 and continuing until 5/11/21, the plaintiff shall pay the following:

    i. An amount equal to 32.5% of his gross base income payable as described infra.

    ii. An amount equivalent to 32.5% of his quarterly bonuses payable upon receipt as described infra.

- For the time period commencing on 5/11/21 and continuing until March 11, 2022, the plaintiff shall pay the following:

    i. 25% of his base bi-weekly gross income payable as set forth infra.

    ii. 25% of his quarterly gross bonuses payable as described infra.

- For federal and state income tax purposes, the unallocated support shall be deductible to the plaintiff and included as income for the defendant.

- Income for purposes of this calculation shall be the parties' respective 'total income' that has historically been listed on line 22 (or the equivalent) of their joint 1040 federal tax returns. This shall include all employment, business, partnership, consulting or real estate income, whether received in cash or not, but shall specifically exclude all interest, dividend and capital gains income realized from assets divided as part of the property distribution component of this dissolution Judgment and any income received by the plaintiff husband as the result of patents or inventions which he has created and obtained. Capital losses, for whatever purpose, shall not serve as a reduction of a parties' income. By way of example, if the numbers contained on the parties' joint 2008 return were used as part of his calculus, the plaintiff's unallocated support obligation would be based on $1,205,113.00 in income (the amount listed on line 22 ($1,216,295,00) plus capital loss ($3,000.00) minus interest $11,527.00) minus ordinary dividends ($2,655.00)). In the event that the plaintiff's employment income is replaced or supplemented by disability insurance payments, those disability insurance payments shall be considered income for purposes of the plaintiff's support obligation(s). This disability provision shall not prevent the plaintiff from seeking a modification of the support orders.

- In the event that the plaintiff husband does not receive a bonus in any year in which he has a support obligation, and has received two bonuses in either the immediately preceding or immediately subsequent year, the plaintiff agrees to include one of said bonuses in each year for purposes of establishing and calculating his support obligation(s).

- The plaintiff husband shall take no action for purposes of defeating the defendant wife's unallocated support, and, shall take no action to reduce, divert, or defer income or increase business expenses or deductions for the purpose of reducing his support obligation to the defendant wife except in the ordinary and reasonable course of business. Without limitation, except as aforestated, items which are taxable to the plaintiff husband because he receives a benefit therefrom shall be included, to the extent they are taxable, for purposes of determining his income.

- For so long as the plaintiff husband has a support obligation hereunder, the parties shall exchange complete individual year-end pay stubs and complete state and federal tax returns (including all schedules, W2, K1 and 1099 forms and the like) that the parties file individually or that is filed by any entity in which the parties' possess an ownership interest on a yearly basis within 14 days of filing.

- The unallocated order shall terminate upon the death of either party and shall terminate upon the remarriage of the defendant wife whereupon the parties shall determine the amount of child support to be paid by the plaintiff husband to the defendant wife for the support of each of the minor children until each child attains the age of 18, graduates from high school, whichever later occurs, but in no event beyond age 19. In the event they are unable to agree, the amount of such child support payments shall be determined by a court of competent jurisdiction. Said amount shall be paid retroactive to the date of the termination of unallocated alimony and child support. The award shall be further be subject to modifications, suspensions or termination pursuant to Conn. Gen. Statute Sec. 46b-86(b), in the event the defendant cohabitates as contemplated by the statute and its attending decisional law.

- The plaintiff's unallocated obligation shall have a twelve year term and shall be non-modifiable as to duration. The term shall commence on the date of Judgment and shall terminate on the twelve year anniversary of

that date. The plaintiff shall pay his obligation on a weekly or biweekly basis, via direct deposit. Historically, the plaintiff has been paid by way of a weekly/biweekly draw and periodic bonuses. The defendant shall be paid her percentage share of the plaintiff's gross income at the time the income is received by the plaintiff. In other words, the defendant shall receive a percentage of the draw as well as a percentage of any bonus payment. All payments shall be received by the defendant wife within seven days of receipt of said compensation by the plaintiff husband.

- The defendant wife shall have a safe harbor to earn up to $50,000.00 per year before the plaintiff husband shall have the right to file a motion for downward modification of his support obligation.

* * *

- The plaintiff husband shall provide wife with copies of his quarterly pay statements for the period ending March 30th, June 30th, September 30th and December 31st each year, all W-2's, K-1's, 1099's from the entities which employ him upon receipt as soon as they are available. The defendant wife shall contemporaneously provide copies of her pay stubs to the plaintiff husband on a quarterly basis. The parties shall review their financial information on or before March 31st or sooner availability of records each year to verify that the plaintiff husband paid alimony in accordance with this Agreement. The parties agree that an accountant designated by the defendant wife, shall audit, at the wife's expense, the above documents to determine if the defendant wife has received the monies due her from the plaintiff husband in accordance with the terms of this Agreement. If the plaintiff husband disagrees with the defendant wife's auditor, he shall have the right to choose his own auditor to verify the amount of alimony payable, at his expense."

[2] The plaintiff's counsel asked the plaintiff: "And we've described in some detail the definition of income. And that would be what you've historically listed on line 22 or the equivalent on your joint 1040 tax returns; and that's all your employment, business, partnership, consulting, or real estate income, no matter how—what form that comes in. And—but it will exclude any interest, dividends, gains that you receive from assets as part of this property settlement. And it will also not include any income received as a result of patents and inventions which you have created and obtained. Correct?" The plaintiff responded: "Yes."

[3] Although both parties testified, the defendant objected to questioning regarding the plaintiff's understanding of the meaning of the word "historical," as used in the income definition provision of the separation agreement. The court sustained the objection on the basis that it had not yet found that the language of the separation agreement was unclear. The court took judicial notice, however, of the March 11, 2010 canvass before Judge Boland.

[4] The trial court identified CSCE as Constitution East Surgical Center and noted that it previously had been known as Constitution Eye Surgical Center. The plaintiff, in his appellate brief, identifies the entity as Constitution Surgery Center East, and we use that name for purposes of this opinion.

[5] The plaintiff also had argued that inclusion of CSCE and ISOI income would result in "double-dipping," in that he had used assets awarded to him in the separation agreement to purchase his interests in CSCE and ISOI and that including income from those interests to calculate the unallocated support would be counting the same basis twice. The court rejected this argument, stating: "This would be so if [the] defendant claimed a portion of the equity [the] plaintiff holds in these companies. She does not. Her claim is only to the partnership income they generate. This is a new, separate basis from the asset awarded to [the] plaintiff at the time of the dissolution or purchased by him with such assets afterward."

[6] The plaintiff also argues that there was never a "meeting of the minds" regarding § 8 of the separation agreement. He emphasizes his testimony, which he describes as "undoubtedly credible," that he "believed the term 'historically' in § 8 of the agreement referred to income from the time the parties were married, which consisted substantially of his biweekly salary and quarterly bonuses." We conclude that this argument, that there was never a meeting of the minds, is inapposite. "The essence of [a stipulated] judgment is that the parties to the litigation have voluntarily entered into an agreement setting their dispute or disputes at rest and that, upon this agreement, the court has entered judgment conforming to the terms of the agreement. . . . It necessarily follows that if the judgment conforms to the stipulation it cannot be altered or set aside without the consent of all the parties, unless it is shown that the stipulation was obtained by fraud, accident or mistake. . . . For a judgment by consent is just as conclusive as one

rendered upon controverted facts." (Internal quotation marks omitted.) *Dougan* v. *Dougan*, 301 Conn. 361, 368–69, 21 A.3d 791 (2011). The plaintiff never filed a motion to open and vacate the dissolution judgment. Cf. *Magowan* v. *Magowan*, 73 Conn. App. 733, 735–37, 812 A.2d 30 (2002), cert. denied, 262 Conn. 934, 815 A.2d 134 (2003).

Moreover, the plaintiff was represented by counsel at the time of the separation agreement's negotiation, he executed the lengthy and detailed agreement, he was canvassed by his counsel regarding the terms of that agreement, and the court, after finding it fair and equitable, incorporated the terms of it into the dissolution judgment. Thus, his argument that an enforceable contract did not exist is unconvincing. See *Tedesco* v. *Agolli*, Superior Court, judicial district of Waterbury, Docket No. CV-12-6016130-S (June 21, 2016) ("[w]hen an agreement is reduced to writing and signed by all parties, the agreement itself is substantial evidence that a meeting of the minds has occurred") (reprinted at 182 Conn. App. 294, 308, 189 A.3d 676), aff'd, 182 Conn. App. 291, 308, 189 A.3d 672, cert. denied, 330 Conn. 905, 192 A.3d 427 (2018).

Lastly, the court credited the defendant's testimony as to the intention of the parties and, thus, implicitly found a mutual understanding of the relevant terms as articulated by the defendant, a finding the plaintiff has not demonstrated is clearly erroneous. See *M.J. Daly & Sons*, *Inc.* v. *West Haven*, 66 Conn. App. 41, 48, 783 A.2d 1138 ("[w]hether a meeting of the minds has occurred is a factual determination"), cert. denied, 258 Conn. 944, 786 A.2d 430 (2001).

[7] The plaintiff contends that future changes in IRS Form 1040 were fully addressed by the reference in § 8 to "line 22 (*or the equivalent*) . . . ." (Emphasis added.) Thus, according to the plaintiff, the court failed to give effect to the clear meaning of the word "historically" and, in doing so, rendered it superfluous. He maintains that if the defendant's interpretation of the parties' intent was correct, "it would have been much easier to simply draft the agreement with the following language, 'Income for the purposes of this calculation is what the IRS requires on line 22 (or the equivalent) of a joint 1040 tax return." We are not persuaded that the court erred in determining that *both* phrases "historically been listed" and "or the equivalent" were necessary to explicate the separation agreement's definition of total income. The word "historically" ensures that the categories of income that comprised line 22 at the time of the dissolution judgment would remain the categories of income from which the plaintiff's future support obligation would be calculated. The phrase "or the equivalent" accounts for the possibility that, at some point in time, the IRS may alter Form 1040 such that line 22 is renumbered.

[8] During the hearing on March 30, 2015, the following exchange occurred with respect to the exclusion for patent income:

"The Court: And you didn't earn any patent income until after the dissolution; is that correct?

"[The Plaintiff]: I still haven't earned any patent income.

"The Court: If your definition—

"[The Plaintiff]: So, I've never earned any patent income.

"The Court: Understood. But the demarcation here is the line drawn by the dissolution.

"[The Plaintiff]: Yes.

"The Court: Prior to the dissolution, you made no patent income?

"[The Plaintiff]: Right.

"The Court: At the time of the dissolution, you excluded patent income?

"[The Plaintiff]: Right.

"The Court: So, patent income would never have been included in the historical category—

"[The Plaintiff]: Right.

"The Court: —to derive line 22. If that's the case, why did you need the page 7 exclusion if historically you had never earned any patent income?

"[The Plaintiff]: Well, I think the reason is because at the time, throughout the years, I had been thinking about some devices and actually went to a company on a couple of occasions with device ideas for patenting, and it never came to fruition.

"The Court: I understand that . . . [b]ut my question is, if the definition of historical never included patent income because you hadn't earned any patent income—

"[The Plaintiff]: Right.

"The Court: —why did you need this second exclusion I'll call it because by your definition, if I'm understanding you correctly, historically would

exclude patent income and yet you included a second sentence to specifically exclude patent income.

"[The Plaintiff]: Well, if it was put to me that way, I probably wouldn't have requested it, but what happened was that while we were marking—going through this, I had mentioned to my attorney that, you know, I kind of have an inventive mind and I think at some point, I might do this, am I protected here, and so she added it in, and I think that they didn't have any problem with that, so it never came up. But if you put it to me as well, you know, patent income, it's not part of your historic so it wouldn't make a difference, then I probably wouldn't—it wouldn't have mattered to me."

[9] The testimony before the court included the defendant's testimony that "historically defined what was required to be listed as income on the 1040 tax return." The plaintiff, in contrast, testified as follows: "It was my understanding that my obligation to pay unallocated support was based upon my historical income. Basically, all the income that I had earned in the past while we were married, it says here on the joint 1040 federal tax returns and to me, my interpretation is we were married and so the money that I had earned during those years was filed on our joint returns." The plaintiff further testified: "So, at the time of the divorce, I had been married for somewhere around [twenty] years, and I had only received one form of income—well, one basic form of income and that was I received biweekly paychecks and quarterly bonuses. So, at the time of the divorce, that was my interpretation of my historical income."

—————————————————