******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES K. GROGAN *v.* JILL PENZA
(AC 41227)

Lavine, Bright and Bear, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff previously had been dissolved, appealed to this court from the judgment of the trial court denying her postdissolution motion for contempt, in which she claimed that the defendant had violated a certain alimony obligation contained in the parties' separation agreement. The separation agreement, which was incorporated into the dissolution judgment, required the plaintiff to pay the defendant alimony based on his annual income from employment, which was defined as line 1 on the plaintiff's annual schedule K-1 from his then employer, the law firm M. Co., and included a requirement that the plaintiff pay the defendant true up alimony based on his gross income over a certain amount. Subsequently, the plaintiff sold his interest in M. Co., where he had been a partner, and became a partner in a new law firm, G. Co. That year, the plaintiff received two schedule K-1s, one from M. Co. and one from G. Co., each of which listed income amounts on lines 1 and 4. The defendant claimed that the plaintiff's true up alimony obligation for that year must be based on the total of all of those lines and filed a motion for contempt based on the plaintiff's nonpayment of any true up alimony for that year. The defendant objected to the plaintiff's motion and requested statutory attorney's fees and costs. The trial court denied the motion for contempt and did not award attorney's fees to either party. On the defendant's appeal and the plaintiff's cross appeal to this court, *held*:

1. The trial court properly denied the defendant's motion for contempt: pursuant to the specific and plain language of the settlement agreement, which the parties freely agreed to use when they drafted the agreement, only income reported on line 1 of the schedule K-1 could be used in calculating the plaintiff's true up alimony obligation, and because the plaintiff's combined line 1 income from both K-1s was less than a certain amount, the defendant was not entitled to any true up alimony for that year; moreover, the defendant's claim that certain language in the parties' agreement required that the reference to line 1 income was meant merely to be an example of one type of employment income that could be considered with other types of alleged income in calculating the plaintiff's true up alimony obligation was belied by the clear and unambiguous language of the agreement.

2. The plaintiff could not prevail on his claim on cross appeal that the trial court improperly denied his request for attorney's fees and costs incurred in successfully opposing the defendant's motion for contempt; following a review of the briefs of the parties and the record of the hearing on the motion for contempt, this court could not conclude that the trial court abused its discretion in declining to award attorney's fees to the plaintiff.

(*One judge concurring in part and dissenting in part*)

Argued April 15—officially released October 29, 2019

*Procedural History*

Action for the dissolution of marriage, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Olear, J.*; judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the court, *Nastri, J.*, denied the defendant's motion for contempt and the plaintiff's request for attorney's fees and costs, and the defendant appealed and the plaintiff cross appealed to this court. *Affirmed.*

*Steven L. Katz*, with whom was *Melissa Gagne*, for the appellant-cross appellee (defendant).

*Mark V. Connolly*, for the appellee-cross appellant (plaintiff).

*Opinion*

BEAR, J. The defendant, Jill Penza, appeals from the judgment denying her postdissolution motion for contempt. On appeal, she claims that the trial court improperly concluded that the plaintiff, James K. Grogan, had not violated a "true up" alimony obligation contained in the parties' separation agreement.[1] The plaintiff cross appeals, claiming that the trial court abused its discretion in denying his request for statutory attorney's fees incurred in defending against the defendant's motion for contempt. We disagree with the parties' claims and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal and cross appeal. On September 25, 2013, the parties, each of whom is an attorney, and each of whom was represented by an attorney, entered into a twenty-three page divorce settlement agreement (agreement). On September 27, 2013, the court, *Olear, J.*, dissolved the parties' marriage. At the time of the dissolution, the plaintiff was a partner at the law firm of McCormick, Paulding & Huber, LLP (MPH). In accordance with General Statutes § 46b-66, the judgment of dissolution incorporated by reference the agreement. Article I of the agreement addressed the plaintiff's various alimony obligations and specified how to calculate such alimony.

Section 1.1 of the agreement provided in relevant part: "The alimony payments detailed [herein] are based on an annual earned income/earning capacity attributed to [the defendant] of $35,000 and the [plaintiff's] 'annual income from employment' (hereinafter 'income') which, for purposes of the alimony formula[s] herein, is presently defined as [l]ine 1 on [the plaintiff's] annual [schedule] K-1[2] from [MPH]. The alimony paid by the [plaintiff] to the [defendant] shall be paid in three components (monthly . . . and quarterly payments totaling $160,000 based on the first $550,000 of [the plaintiff's] income, and a year-end 'true up' alimony payment based on gross income of the [plaintiff] between $550,000 and $750,000)." (Footnote added.)

The true up alimony formula applicable in the present case was set forth in § 1.1 D of the agreement, which provided in relevant part: "For the tax year 2014 and thereafter, [the plaintiff] shall pay 'true up' alimony to [the defendant] of 25 [percent] of the amount of [the plaintiff's] income between $550,000 and $700,000 as reflected on [l]ine 1 of [the plaintiff's schedule] K-1 and 20 [percent] of any income between $700,000 and $750,000. For example, if [the plaintiff's schedule] K-1 for 2014 shows [l]ine 1 income of $775,000, [the plaintiff] would owe [the defendant] additional 'true up' alimony in the amount of $47,500 . . . ."

In June, 2015, the plaintiff sold his interest in MPH,

where he had been a partner for over twenty years, and created a new law firm, Grogan, Tuccillo & Vanderleeden, LLP (GTV), located in Springfield, Massachusetts. GTV, like MPH, was structured as a partnership. As a result, the plaintiff received two schedule K-1s for the 2015 tax year, one from MPH covering the period between January 1 and May 31, 2015, and one from GTV covering the period between June 1 and December 31, 2015. The schedule K-1 issued by MPH listed negative $93,463 of "[o]rdinary business income (loss)" on line 1 and $605,000 of "[g]uaranteed payments" on line 4.[3] The schedule K-1 issued by GTV listed $103,017 on line 1 and $127,178 on line 4. In previous years, when he was employed by MPH, all of the income the plaintiff received from employment had been reported on line 1 of his schedule K-1s.

On May 31, 2017, the defendant filed a motion for contempt alleging that the plaintiff wilfully had violated the parties' agreement by failing to pay her true up alimony for the 2015 tax year. More specifically, the defendant claimed that the plaintiff's 2015 "annual income from employment" was $741,732—the total of lines 1 and 4 from both schedule K-1s—and that, consequently, she was entitled to $45,846 of true up alimony pursuant to § 1.1 D of the agreement. In his memorandum of law in opposition to the motion, the plaintiff countered that § 1.1 D clearly and unambiguously provided that his annual income from employment was to be determined solely by reference to line 1 of his schedule K-1s. Accordingly, the plaintiff argued that he owed no true up alimony for 2015 because his total line 1 income across both schedule K-1s amounted to only $9554—well below the $550,000 threshold required by the agreement. The plaintiff therefore requested that the court deny the defendant's motion for contempt and award him costs and reasonable attorney's fees pursuant to General Statutes § 46b-87.

The trial court, *Nastri*, *J.*, conducted an evidentiary hearing on the defendant's motion for contempt on September 28 and October 13, 2017. On December 4, 2017, following posttrial briefing by the parties, the court issued a memorandum of decision holding that § 1.1 D of the agreement was clear and unambiguous and limited the plaintiff's income from his employment for purposes of calculating true up alimony to the amount listed on line 1 of the plaintiff's schedule K-1. The court rejected the defendant's argument that it should look to lines 1 and 4 of the 2015 schedule K-1s to determine the total of the plaintiff's income from his employment. It explained that the defendant's argument, that the amounts listed on both lines 1 and 4 of the schedule K-1s should be considered income, required the court to ignore the language in § 1.1 C and D of the agreement. Accordingly, the court denied the defendant's motion, but it declined to award attorney's fees to the plaintiff. This appeal and cross appeal

followed.

# I

## THE DEFENDANT'S APPEAL

On appeal, the defendant claims that the trial court improperly concluded that the plaintiff had not violated the true up alimony provision contained in § 1.1 D of the agreement. Her principal argument is that the court erred in determining that only income listed on line 1 of a schedule K-1 may be considered for purposes of calculating true up alimony due to her under § 1.1 D of the agreement.[4] We disagree.

We begin with general principles and the applicable standards of review. "It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. . . . When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. . . .

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citation omitted; emphasis

omitted; internal quotation marks omitted.) *Parisi* v. *Parisi*, 315 Conn. 370, 383–84, 107 A.3d 920 (2015); see also *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 191–92, 112 A.3d 144 (2015); *Dejana* v. *Dejana*, 176 Conn. App. 104, 115, 168 A.3d 595 (when language in question is clear and unambiguous, contract must be given effect according to its terms, and determination of parties' intent is question of law), cert. denied, 327 Conn. 977, 174 A.3d 195 (2017). "Furthermore, [i]n giving meaning to the language of a contract, we presume that the parties did not intend to create an absurd result." (Internal quotation marks omitted.) *South End Plaza Assn., Inc.* v. *Cote*, 52 Conn. App. 374, 378, 727 A.2d 231 (1999).

The defendant argues that the court's interpretation of the true up alimony provision set forth in § 1.1 D was flawed because it rendered superfluous the "presently defined" language in § 1.1, which, according to the defendant, applies to subsection D. More specifically, the defendant contends that, "[b]y specifically stating that income was 'presently defined' as line 1 of [the defendant's] schedule K-1, it is abundantly clear that the parties did not intend to permanently define income as line 1 of a schedule K-1." (Emphasis omitted.) Rather, in the defendant's view, this language indicates that the reference to line 1 income "was an example and [was] not meant to be determinative." Thus, according to the defendant, "[t]he placement of the plaintiff's earnings, whether on line 4 or line 1 of the schedule K-1 or any other income reporting form, should not bar recovery of true up alimony." (Internal quotation marks omitted.)

Section 1.1 of the parties' agreement sets forth the definition of the plaintiff's income "*for purposes of the alimony formula herein* . . . ."[5] (Emphasis added.) The only alimony formulas in the agreement that refer to the plaintiff's income are the true up alimony formulas contained in subsections C and D of § 1.1. Pursuant to § 1.1, the income to be used to calculate the plaintiff's true up alimony obligations under these subsections "is *presently* defined as [l]ine 1 on [the plaintiff's] annual [schedule] K-1 from [MPH]." (Emphasis added.) We disagree with the defendant, however, that this "presently defined" language requires that the reference to line 1 income was meant merely to be an example of one type of employment income that could be considered, at the defendant's election to do so, with other types of alleged income in calculating the plaintiff's true up alimony obligation. This claim is belied by the clear and unambiguous language of § 1.1 D, which provides that "[f]or the tax year 2014 and thereafter, [the plaintiff] shall pay 'true up' alimony to [the defendant] of 25 [percent] of the amount of [his] income between $550,000 and $700,000 as reflected on [l]ine 1 of [the plaintiff's schedule] K-1 and 20 [percent] of any income between $700,000 and $750,000. For example, if [the plaintiff's schedule] K-1 for 2014 shows [l]ine 1 income of $775,000, [the plaintiff] would owe [the defendant]

additional 'true up' alimony in the amount of $47,500 . . . ." A court cannot ignore or disregard the language of the agreement because in hindsight an additional or more expansive term would have been better for one of the parties. See, e.g., *Crews* v. *Crews*, 295 Conn. 153, 169, 989 A.2d 1060 (2010); *Chang* v. *Chang*, 170 Conn. App. 822, 828, 155 A.3d 1272, cert. denied, 325 Conn. 910, 158 A.3d 321 (2017).

To the extent that there is any conflict in the reasonable interpretation of the language of the agreement set forth in § 1.1 and § 1.1 D, which we do not credit, the more specific language in § 1.1 D controls over the more general language in § 1.1: "[I]t has been well settled that 'the particular language of a contract must prevail over the general.' " *Issler* v. *Issler*, 250 Conn. 226, 237 n.12, 737 A.2d 383 (1999), see also *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 273, 439 A.2d 314 (1981); *Miller Bros. Construction Co.* v. *Maryland Casualty Co.*, 113 Conn. 504, 514, 155 A. 709 (1931).

The defendant has neither provided analysis nor cited to any legal authority to support her contention that the addition of the word "presently"[6] somehow transforms the definition of "annual income from employment" set forth in § 1.1 into a mere example that can be expanded upon by adding another line from the schedule K-1. See *Packard* v. *Packard*, 181 Conn. App. 404, 406, 186 A.3d 795 (2018) ("analysis, rather than mere abstract assertion, required to avoid abandoning issue by failing to brief issue properly; where claim receives only cursory attention without substantive discussion or citation of authorities, it is deemed abandoned"). Moreover, the defendant's position is untenable when § 1.1 is interpreted in light of the situation of the parties at the time of the dissolution.

The "presently defined as [l]ine 1 on [the defendant's] annual K-1 from [MPH]" language set forth in § 1.1 referred to the plaintiff's then income from his employment at MPH, *for purposes of the alimony formula*. It is not specified in the agreement that the line 1 language is limited solely to the year 2013 when the agreement was made, and, thereafter, the definition of the plaintiff's annual income from employment in subsequent years would be open to review and revision, except in § 1.3, which anticipates the plaintiff's possible retirement justifying a second look at his alimony obligation. There was no dispute between the parties about the amount of the plaintiff's line 1 income for 2014, and there was no line 4 income in that year. The relevant language of § 1.1 D is clear: for the tax year 2014 and thereafter, the plaintiff shall pay true up alimony to the defendant from his income as reported on line 1 of his schedule K-1. It is also not specified in the agreement that there would be an automatic "second look" if there were entries on line 4, or any other lines other than

line 1, in 2014 or in any other subsequent year. Given the clear and unambiguous language of § 1.1 D, if the $605,000 in "guaranteed payments" from line 4 of the MPH schedule K-1 for 2015 were used to calculate the plaintiff's true up alimony obligation, the agreement certainly would be violated. Without the inclusion of the $605,000 in the calculation of the plaintiff's income, the plaintiff's income in 2015 did not exceed $550,000.

The trial court recognized the differentiation between the application of the line 1 limitation in the true up alimony formula and the lack of its limitation to a specific year when it rejected the defendant's arguments and found that, in reaching their agreement, the parties were free to define income in any way they wanted and did not have to use the schedule K-1 to do so. Having agreed to use the schedule K-1, the parties could have referenced any of the lines therein, including lines 1 and 4, or any other combination of lines in part III of the schedule K-1, titled "Partner's Share of Current Year Income, Deductions, Credits and Other Items." The parties, however, agreed that the plaintiff's income, for alimony purposes, was limited to line 1 of the plaintiff's schedule K-1. At no time prior to or after the defendant's filing of her motion for contempt did she file any motion for modification of the alimony terms or any other motion concerning the definition of alimony in the agreement, so the court did not have the authority during the hearing on the contempt motion to modify the alimony terms. See *Connolly* v. *Connolly*, 191 Conn. 468, 474–75, 464 A.2d 837 (1983).

At the time of the dissolution of the parties' marriage in 2013, the plaintiff had been a partner at MPH for over twenty years, and, during this time, his income from such employment had always been reported on line 1 of the schedule K-1s prepared by its outside accountants and issued by that law firm. That continued in 2014 and 2015. After the defendant left MPH on May 31, 2015, his new law firm, GTV, was set up as a partnership that also provided a schedule K-1 to the plaintiff with respect to his annual income from such employment. He thus received schedule K-1 forms from both MPH and GTV for the 2015 tax year, which forms had been prepared by their respective outside accountants. He did not receive a W-2 form for the 2015 tax year from MPH or GTV, or any other type of form related to his employment income. It is thus inappropriate to speculate about the possible effect, if any, on the application of the agreement of his receipt of such other income reporting forms.

We, therefore, agree with the trial court that, pursuant to the specific and plain language of the agreement set forth in § 1.1 D, only income reported on line 1 of the plaintiff's annual schedule K-1s could be used in calculating his 2015 true up alimony obligation. Because the plaintiff's combined line 1 income from both 2015 K-1s

was less than $550,000, the defendant was not entitled to any true up alimony, and, consequently, the trial court properly denied the defendant's motion for contempt.

## II

### THE PLAINTIFF'S CROSS APPEAL

In his cross appeal, the plaintiff claims that the trial court abused its discretion in denying his request for attorney's fees and costs incurred in successfully opposing the defendant's motion for contempt. We disagree.

"Our law for awarding attorney's fees in contempt proceedings is clear. General Statutes § 46b-87 provides that the court may award attorney's fees to the prevailing party in a contempt proceeding. The award of attorney's fees in contempt proceedings is within the discretion of the court. . . . In making its determination, the court is allowed to rely on its familiarity with the complexity of the legal issues involved. Indeed, it is expected that the court will bring its experience and legal expertise to the determination of the reasonableness of attorney's fees. . . . Moreover, because the award of attorney's fees pursuant to § 46b-87 is punitive, rather than compensatory, the court properly may consider the defendant's behavior as an additional factor in determining both the necessity of awarding attorney's fees and the proper amount of any award." (Internal quotation marks omitted.) *Pace* v. *Pace*, 134 Conn. App. 212, 218, 39 A.3d 756 (2012).

In the present case, the record does not reveal the court's reason for denying the plaintiff's request for attorney's fees and whether, or to what extent, it considered such factors as the merits of the defendant's motion for contempt, the complexity of the legal issues involved, and the defendant's behavior. In its memorandum of decision, the court simply ordered that "[n]o attorney's fees are awarded to either party." Following our review of the briefs of the parties and the record of the hearing on the motion for contempt, we are unable to conclude that the court abused its discretion in declining to award attorney's fees to the plaintiff.

The judgment is affirmed.

In this opinion LAVINE, J., concurred.

[1] The defendant also claims that the trial court (1) "improperly calculated the plaintiff's annual income for purposes of determining the 'true up' alimony obligation owed to the defendant," (2) "erred in failing to order the plaintiff to pay $45,846 to the defendant for 'true up' alimony due for 2015," and (3) "erred in denying the defendant's motion for contempt [on the basis of] its conclusion that no 'true up' alimony was due and owing to the defendant." Because we conclude that the trial court properly determined that no true up alimony was owed, these claims necessarily fail.

[2] "A schedule K-1 is the document that states each individual partner's proportionate income or loss based upon [his or her] percentage ownership. The income or loss on the schedule K-1 is in turn reported on each partner's individual tax return." (Internal quotation marks omitted.) *McTiernan* v. *McTiernan*, 164 Conn. App. 805, 813 n.10, 138 A.3d 935 (2016).

[3] The trial court found that the plaintiff had had no control over how his income was reported on his 2015 schedule K-1.

[4] The defendant argues in the alternative that the language of § 1.1 D

was ambiguous and that the court therefore should have sought extrinsic evidence to determine the parties' intent. Rather than analyze the language of this provision and explicate why, in her view, it was ambiguous, the defendant merely states in a conclusory manner that "the settlement agreement was not clear and unambiguous as found by the trial court." The defendant therefore has abandoned this issue by failing to brief it properly. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]). Nevertheless, as our discussion of the defendant's principal argument demonstrates, the contract language at issue is clear and unambiguous in the context of the present case.

[5] "'Herein' as used in legal phraseology is a locative adverb and its meaning is to be determined by the context. It may refer to the section, the chapter or the entire enactment in which it is used." *Gatliff Coal Co.* v. *Cox*, 142 F.2d 876, 882 (6th Cir. 1944).

[6] "Presently" is an adverb that simply means "now" or "at the present time." Webster's Third New International Dictionary (2002), p. 1793.