******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JANEL SIMPSON *v.* ROBERT R. SIMPSON
## (SC 20988)

D'Auria, Ecker, Alexander, Dannehy and Seeley, Js.

*Syllabus*

The plaintiff appealed, on the granting of certification, from the judgment of the Appellate Court, which had reversed in part the trial court's rulings on certain of the parties' postdissolution judgment motions, including the plaintiff's motion for modification of child support and alimony based on an allegedly substantial change in the defendant's income. Those rulings led to the issuance of remedial orders concerning the defendant's obligation to pay additional child support and alimony under the parties' separation agreement, which had been incorporated into the dissolution judgment. On appeal to this court, the plaintiff claimed that the Appellate Court had incorrectly concluded that the relevant provisions of the parties' separation agreement unambiguously relieved the defendant of the obligation to pay additional child support and alimony on the amount of his gross income, including his base draw, bonuses, and profit sharing, in excess of $700,000. *Held*:

Contrary to the Appellate Court's conclusion, the provisions of the separation agreement relating to the defendant's obligation to pay additional child support and alimony based on bonuses and profit sharing beyond the defendant's base salary were ambiguous, and, accordingly, the Appellate Court's judgment was reversed in part and the case was remanded for consideration of extrinsic evidence with respect to the parties' intent concerning those provisions of the separation agreement.

Because both parties set forth a plausible construction of the relevant provisions of the separation agreement, with both constructions having bases in the language used in the agreement, this court concluded that the agreement was ambiguous, with its meaning presenting a question of fact for the trial court to consider and resolve.

Accordingly, the case was remanded to the trial court to resolve the ambiguity in the relevant provisions of the separation agreement through a determination of the parties' intent after consideration of all available extrinsic evidence and the circumstances surrounding the formation of the agreement.

There was no merit to the defendant's claim that the plaintiff's evidentiary and legal strategy at trial operated to judicially estop a remand for a factual determination of the parties' intent, as the doctrine of judicial estoppel did not apply insofar as there was no bad faith on the part of the plaintiff, the plaintiff's position on appeal was not clearly inconsistent with the position she had taken before the trial court, the trial court did not rely on the plaintiff's position that the relevant provisions of the separation agreement

were unambiguous, there was no unfair advantage to the plaintiff, and the defendant did not and will not suffer any prejudice.

Argued February 5—officially released June 10, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the defendant filed a cross complaint; thereafter, the court, *Albis, J.*, rendered judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; subsequently, the court, *M. Murphy, J.*, denied the plaintiff's postjudgment motions for contempt and for modification of child support and alimony, denied the defendant's postjudgment motion for modification of child support, and issued certain orders in connection with the plaintiff's motions for order regarding college education costs and attorney's fees, and the defendant appealed and the plaintiff cross appealed to the Appellate Court, *Prescott* and *Clark, Js.*, with *Alvord, J.*, concurring in part and dissenting in part, which reversed in part the judgment of the trial court and remanded the case for further proceedings, and the plaintiff, on the granting of certification, appealed to this court. *Reversed in part*; *further proceedings*.

*Michael S. Taylor*, with whom were *Brendon P. Levesque* and, on the brief, *Corinne A. Burlingham*, for the appellant (plaintiff).

*Campbell D. Barrett*, with whom were *Stacie L. Provencher* and, on the brief, *Dana M. Hrelic*, for the appellee (defendant).

*Opinion*

ALEXANDER, J. This certified appeal requires us to construe provisions in a separation agreement governing obligations to pay additional child support and alimony on the basis of the payor spouse's income

attributable to bonuses and profit sharing. Upon our grant of her petition for certification,[1] the plaintiff, Janel Simpson, appeals from the judgment of the Appellate Court reversing in part the decision of the trial court, which had issued certain remedial orders in connection with the obligation of the defendant, Robert R. Simpson, to pay additional child support and alimony under the separation agreement that was incorporated into the judgment dissolving the parties' marriage. *Simpson* v. *Simpson*, 222 Conn. App. 466, 470, 498, 306 A.3d 477 (2023). On appeal, the plaintiff claims that the Appellate Court incorrectly concluded that the separation agreement unambiguously relieved the defendant from the obligation to pay additional child support and alimony after his gross income, including his base draw, bonuses, and profit sharing, exceeded $700,000. We conclude that the relevant provisions of the separation agreement are ambiguous on this point and that a remand to the trial court is required for consideration of extrinsic evidence as to the parties' intent. Accordingly, we reverse in part the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history. The parties were married in May,

---

[1] We granted the plaintiff's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court err in reversing the trial court's remedial orders on the basis of its erroneous conclusion that the parties' separation agreement clearly and unambiguously relieved the defendant of the obligation to pay supplemental child support and alimony?" And (2) "[d]id the Appellate Court err in concluding that the parties' separation agreement clearly and unambiguously relieved the defendant of the obligation to pay supplemental child support and alimony when, inter alia, (a) both parties advanced reasonable and plausible interpretations of the relevant provisions, (b) the Appellate Court majority failed to give effect to the intent of the parties as expressed in the agreement, (c) the concurring and dissenting judge correctly concluded that the agreement was ambiguous and thus its meaning presented a question of fact for the trial court, and (d) both the majority and the concurring and dissenting judge noted the absence of extrinsic evidence on the issue of the parties' intent, as well as the need for such evidence in order to interpret the agreement?" *Simpson* v. *Simpson*, 348 Conn. 942, 942–43, 307 A.3d 909 (2024).

1995. They had two children together, A, who was born in 2000, and G, who was born in 2004. The plaintiff brought an action for dissolution of the marriage in December, 2011, and the trial court, *Albis, J.*, rendered judgment dissolving the parties' marriage on October 28, 2013, on the ground that the marriage had broken down irretrievably. The judgment of dissolution incorporated by reference the parties' separation agreement dated October 24, 2013, and the addendum to the separation agreement dated October 28, 2013 (agreement). The agreement governs the parties' rights and responsibilities with respect to custody and parenting of A and G, alimony, child support, postmajority educational support, and the division of various marital assets and debts. The parties are professionals with advanced degrees, both of whom were represented by counsel in the dissolution proceedings and the negotiation of the agreement.

Article IV of the agreement governs child support. With respect to base income, § 4.1 of the agreement requires the defendant to pay the plaintiff child support of $420 per week on his base draw, which, at the time of the judgment, was $298,686 per year.[2] Section 4.2 of the agreement,[3] which is the primary provision at issue

[2] Section 4.1 of the agreement provides: "The [plaintiff] is presently earning $135,000 per year. The [defendant's] present [base] draw from his employment is $298,686 per year. The [defendant] shall pay to the [plaintiff] as child support effective with the date of [j]udgment the sum of $420 per week. If either party's base income changes ($298,686 presently for the [defendant] and $135,000 for the [plaintiff]) such that there is a 15 [percent] or more differential in the amount of child support that should be paid in accordance with the [c]hild [s]upport [g]uidelines, then the parties will recalculate the new amount of [c]hild [s]upport and modify the present amount."

[3] Section 4.2 of the agreement provides: "From the [defendant's] anticipated bonus or profit sharing from his employment received on or after January 1, 2016, which he usually receives in January of each year, once the back taxes for 2012 and 2013 are paid in full as described in this [a]greement below, the [defendant] will pay to the [plaintiff] 9 percent of his gross bonus/profit sharing so long as the [defendant] is obligated to pay child support for two children; and, the sum of the 6 percent of his gross bonus/

in this appeal relating to child support, governs the defendant's obligations to pay additional child support arising from his employer's bonus or profit sharing. It requires the defendant to pay to the plaintiff 9 percent of his gross bonus or profit sharing for two children, and 6 percent for one child; it defines bonus and profit sharing as the "total gross payment the [defendant] receives, less any portion that is part of his normal monthly draw and less any portion that is part of his normal quarterly tax payment draw he receives." It also provides that "[t]*here will be no child support paid on the* [*defendant's*] *gross earned income in excess of $700,000 per calendar year.*" (Emphasis added.)

Article VI of the agreement governs alimony, which the defendant was obligated to pay to the plaintiff until September 30, 2022, unless either party dies or the plaintiff remarries. Under § 6.3 of the agreement, upon the sale of the family home, the defendant is required to pay the plaintiff alimony in the sum of $1750 per month. Sections 6.4[4] and 6.5 of the agreement require the defendant to pay to the plaintiff additional alimony in the amount of 20 percent of his gross bonus or profit sharing amount, effective with his January, 2016 bonus or profit

profit sharing when there is only one minor child for whom the [defendant] is obligated to pay child support. *There will be no child support paid on the* [*defendant's*] *gross earned income in excess of $700,000 per calendar year. For the purposes of this paragraph, the bonus/profit sharing shall be considered as the total gross payment the* [*defendant*] *receives, less any portion that is part of his normal monthly draw and less any portion that is part of his normal quarterly tax payment draw he receives.*" (Emphasis added.)

[4] Section 6.4 of the agreement provides: "Effective with his January 2016 bonus/profit sharing plan payment, the [defendant] shall pay to the [plaintiff] 20 percent of the [defendant's] gross bonus/profit sharing amount as additional alimony; *however, there will be no alimony paid on the* [*defendant's*] *gross earned income in excess of $700,000 per calendar year. For the purposes of this paragraph, the bonus/profit sharing shall be considered as the total gross payment the* [*defendant*] *receives, less any portion that is part of his normal monthly draw and less any portion that is part of his normal quarterly tax payment draw he receives.*" (Emphasis added.)

sharing payment for a nonmodifiable term ending on December 31, 2024;[5] § 6.4 is worded identically to § 4.2 in all relevant respects. Unless the plaintiff remarried, the additional alimony amount was payable from January, 2016, through December 31, 2024. Section 6.6 of the agreement requires the defendant to provide to the plaintiff "each year within seven days of his receipt of any bonus/profit sharing written evidence of said bonus/ profit sharing as well as a check for [the plaintiff's] share, if any." Finally, § 6.8 of the agreement memorializes the "intention" of the parties, after the sale of the family home, "that they each have 50 [percent] of the net after tax income, using the [plaintiff's] salary and the [defendant's] base draw [of $298,686] or regular paychecks, currently approximately $433,000 per annum in the aggregate." Section 6.8 also provides for renegotiation of the alimony provisions "in such a manner as to duplicate the alimony considerations and intentions contained in [the] [a]greement" in the event that the defendant's "compensation package materially changes, either because his base income and/or bonus/profit sharing structures [change] within his present employment or at a future employment . . . ."[6]

---

[5] Section 6.5 of the agreement further provides that, if the plaintiff were to remarry prior to January, 2018, she would be entitled to the additional alimony amounts for 2016, 2017, and 2018, with the defendant's obligation to pay terminated thereafter.

[6] Section 6.8 of the agreement provides: "If the [defendant's] compensation package materially changes, either because his base income and/or bonus/ profit sharing structures [change] within his present employment or at a future employment, the parties shall renegotiate the alimony and tax payment provisions in such a manner as to duplicate the alimony considerations and intentions contained in this [a]greement. In determining the amounts of child support and alimony to be paid and received for so long as the [plaintiff] remains unmarried, it is the parties intention that until the family home is sold, the [plaintiff] shall have 55 [percent] and the [defendant] shall have 45 [percent] of the net after tax income using only the [plaintiff's] salary and the [defendant's] base draw or regular paychecks. Once the family home is sold, [it is] the [parties'] intention that they each have 50 [percent] of the net after tax income, using the [plaintiff's] salary and the [defendant's] base draw or regular paychecks, currently approximately $433,000 per annum in the aggregate."

In July, 2018, the plaintiff filed a postjudgment motion for contempt, claiming that the defendant had failed to comply with his child support and alimony obligations under the agreement.[7] The plaintiff alleged that the defendant had wilfully breached his obligations under the agreement to pay the required percentages of his "gross bonus/profit sharing income over his base salary capped at a total of $700,000," as "additional" child support and alimony, resulting in arrearages. The plaintiff subsequently amended her motion for contempt to challenge the defendant's alleged failure to provide her with pay stub copies as required by § 6.6 of the agreement, causing her to sustain additional losses because she was unaware of increases to his base compensation, and his alleged failure to pay his 50 percent share of the costs for the children's activities, as required by § 4.3 of the agreement. The defendant objected to the motion for contempt.

The plaintiff filed two additional motions. First, the plaintiff moved for orders enforcing article V of the agreement, which reserved jurisdiction for the trial court to render educational support orders for college expenses of A and G in accordance with General Statutes § 46b-56c. Second, the plaintiff moved for modification of child support and alimony on the ground that there had been a substantial change in the defendant's compensation since the date of the dissolution judgment. The defendant objected to the motion for modification and filed his own motion for modification in October, 2018, seeking a decrease in child support given that A would reach the age of majority later that month.

After a five day evidentiary hearing commencing in March, 2020,[8] the trial court, *M. Murphy, J.*, issued a

---

[7] Prior to filing the motion for contempt at issue in this appeal, in June, 2017, the plaintiff filed a motion to compel payment of alimony, child support, and child related expenses. Following extensive discovery, the plaintiff withdrew the motion to compel on July 3, 2018.

[8] The first day of the hearing was held in person, and the four subsequent days of the hearing were conducted remotely via Microsoft Teams given the emergence of the COVID-19 pandemic.

comprehensive memorandum of decision in which it resolved the parties' various motions. With respect to the contempt motion alleging the defendant's failure to pay additional child support and alimony based on his profit sharing and bonuses, the trial court noted the parties' conflicting interpretations of the applicable provisions of the agreement, namely, §§ 4.2, 6.4 and 6.8. The trial court concluded that these provisions were "not clear and unambiguous" and that, as a result, it could not find the defendant in contempt. Although the trial court stated that it would consider extrinsic evidence to resolve that ambiguity with respect to "the conditions for the payments of additional child support and alimony," it did not include any such evidence in its memorandum of decision.[9] Instead, the trial court agreed with the plaintiff's interpretation of the agreement to require a "formula to calculate the maximum additional child support and alimony on the bonus" of $700,000, which is the stated income cap, less $298,686, which is the stated "artificial" base draw, to yield a maximum bonus amount of $401,314 for purposes of applying the stated child support and alimony percentages. The trial court then applied that formula to the defendant's bonuses from 2015 through 2018,[10] and issued a variety of financial orders directing the defendant to pay a total of $327,691 in arrearages to the

[9] To the extent the trial court considered the testimony of the parties on this point, it did so only to reject the defendant's testimony that § 6.8 of the agreement, which requires renegotiation in the event of material changes to his compensation, is limited to changes to the structure of base draw, tax payment draw, and bonus. The trial court also rejected the defendant's testimony that § 6.8 does not encompass "significant" increases or decreases in the compensation amount alone.

[10] The plaintiff's gross bonuses, all of which were paid in January of the following year, were $360,346 for 2015, $457,771 for 2016, $731,149 for 2017, and $626,836 for 2018. The trial court determined that the defendant had not provided "credible evidence of what part, if any, of [those] bonus payments were allocated to his monthly base draw or the January portion of the quarterly tax payments," rendering the complete amounts "eligible" for the calculation of additional child support and alimony payments.

plaintiff plus child support and alimony going forward under the agreement as construed. The trial court ordered the defendant to pay down the arrearage at a rate of $10,000 per month and directed that those payments take precedence over all other voluntary charitable and retirement contributions, with the potential for wage withholding in the event that arrearage payments are more than thirty days late.[11]

The trial court issued several other orders in connection with the remaining motions that constituted a "mosaic" of the defendant's obligations. Specifically, the trial court (1) denied the parties' cross motions for modification of child support and alimony,[12] (2) found that the defendant had failed to pay certain agreed on expenses for A and G, as required by § 4.3 of the agreement, and ordered him to pay $1796.44 for his unpaid share of those expenses, (3) ordered the parties to share costs for A's college education, with the defendant responsible for 90 percent and the plaintiff responsible for 10 percent of those costs, and (4) ordered the defendant to pay 80 percent of the plaintiff's attorney's fees and costs, or $57,625.[13]

The defendant appealed from the trial court's decision, and the plaintiff cross appealed. See *Simpson* v. *Simpson*, supra, 222 Conn. App. 469–70. Following an Appellate Court order granting review of the trial court's initial denial of the plaintiff's motion for articulation, the trial court issued an articulation, clarifying that

---

[11] The trial court denied the plaintiff's motion for contempt with respect to the defendant's failure to provide documentation pursuant to § 6.7 of the agreement. It used, however, its remedial powers to clarify and "expand" the defendant's obligations to provide detailed pay summaries from his employer as to the amount of, and any deductions from, his annual bonus.

[12] The trial court subsequently denied the plaintiff's motion for reargument of the denial of her motion for modification.

[13] The plaintiff subsequently moved for clarification and to correct certain scrivener's and calculation errors in the memorandum of decision not relevant to this appeal. The trial court granted this motion in part.

there was a total arrearage of $332,692 and the methods by which the additional child support and alimony payments would be calculated under §§ 4.2 and 6.4 of the agreement. With respect to the additional child support and alimony amounts, the trial court clarified that they would be "based on the lesser of $700,000 or the actual bonus amount for a taxable year . . . reduced by" the determined base draw amount of $298,686, and then multiplied by the applicable percentage under the agreement, namely, 9 or 6 percent for child support and 20 percent for alimony.

In a divided opinion, the Appellate Court subsequently agreed with the defendant's claim on appeal[14] that, "in crafting remedial orders in response to the plaintiff's motion for contempt, the [trial] court improperly interpreted the . . . agreement" with respect to additional child support or alimony by applying "the $700,000 cap to his bonus only," rather than to all " 'gross earned income' in excess of $700,000 per calendar year . . . ." *Simpson* v. *Simpson*, supra, 222 Conn. App. 482. The Appellate Court concluded that the defendant's reading of the agreement was consistent with the clear and unambiguous language of §§ 4.2 and 6.4 of the agreement, which referred to "the defendant's *'gross earned income* in excess of $700,000 per calendar year.' " (Emphasis in original.) Id. 484. The Appellate Court determined that the trial court's contrary reading had led to a rewriting of the agreement to provide what the trial court determined to be a more equitable outcome by "accepting the plaintiff's contention that the

---

[14] The defendant also claimed that the trial court improperly (1) "modified its original decision on the postjudgment motions by way of a postappeal articulation," (2) "awarded attorney's fees to the plaintiff," and (3) "rendered an educational support order that failed to comply with . . . § 46b-56c." *Simpson* v. *Simpson*, supra, 222 Conn. App. 469. In her cross appeal, the plaintiff agreed with the defendant as to the articulation; see id., 480–82; and claimed that the trial court "improperly denied her motion seeking a modification of alimony and child support." Id., 469.

$700,000 cap applied only to the defendant's bonus
. . . ." Id., 485; see id., 486 (concluding that plaintiff's
remedy was renegotiation of child support and alimony
pursuant to §§ 4.1 and 6.8 of agreement "in the event
that the defendant's compensation package materially
changes"). Thus, the Appellate Court concluded that "the
agreement set a fixed amount of alimony and child
support tied to a defined base pay amount, [and] once
the defendant's base pay reached $700,000, any addi-
tional support payments would be in excess of the
$700,000 cap." Id., 487; see id. ("in any year in which
[the defendant's] base income—normal monthly draw
and quarterly tax payments—exceeded $700,000, his
gross earned income reached the agreed [on] cap, and
he would not have accrued any obligation for additional
child support or alimony"). The Appellate Court reversed
the trial court's judgment with respect to "its calculation
of the arrearage owed by the defendant to the plaintiff"
and remanded the case for further proceedings that
"involve application of the clear and unambiguous lan-
guage of the agreement to calculate any additional ali-
mony or child support obligation." Id., 487–88. Given
its effect on the "mosaic," the Appellate Court con-
cluded that the error as to the additional child support
and alimony required it to vacate all of the trial court's
other financial orders, as well.[15] See id., 488, 497–98.

Judge Alvord dissented in part from the majority opin-
ion of the Appellate Court, disagreeing with its conclu-
sion that the agreement "is clear and unambiguous
regarding the terms of the obligation of the defendant
. . . to pay child support and alimony." Id., 498 (*Alvord,
J.*, concurring in part and dissenting in part). Given her

---

[15] The Appellate Court also reversed the trial court's educational support
order and remanded for a new hearing as to the college costs with respect
to A's enrollment at Clemson University, concluding that the trial court's
finding that the parties had agreed to exceed the "UConn cap" under § 46b-
56c was clearly erroneous. *Simpson* v. *Simpson*, supra, 222 Conn. App. 495.

conclusion that the plaintiff had set forth a reasonable construction of the agreement that "would give effect to the defendant's $700,000 earned income cap agreed to by the parties in their agreement at the time of their divorce"; id. 502 (*Alvord, J.*, concurring in part and dissenting in part); Judge Alvord "would remand [the] case to the trial court to hold a new hearing on the plaintiff's motion for contempt and to determine the intent of the parties after consideration of all the available extrinsic evidence and the circumstances surrounding the entering of the agreement." (Internal quotation marks omitted.) Id., 503–504 (*Alvord, J.*, concurring in part and dissenting in part).

On appeal to this court, the plaintiff relies heavily on Judge Alvord's opinion and claims that the Appellate Court majority's reading of the agreement is unduly restrictive and nullifies the intent of the parties, which was for the "additional alimony and child support payments [to] reflect [the defendant's] income." She argues that the Appellate Court incorrectly read a single sentence in §§ 4.2 and 6.4 of the agreement, namely, "[t]here will be no child support [or alimony] paid on the [defendant's] gross income in excess of $700,000 per calendar year," as "free[ing] [the defendant] of any obligation to pay additional child support and alimony if his actual earned income exceeds $700,000," rather than treating that amount as a "cap" under which "the defendant is only required to share his yearly bonuses up to $700,000 less his 2013 base pay, and anything he makes beyond $700,000 will not be subject to [§§] 4.2 and 6.4." (Internal quotation marks omitted.) Contending that these provisions should be read consistently with the intention, as set forth in § 6.8, of a 50 percent share of the parties' combined net income, the plaintiff argues further that the percentage based child support and alimony should be calculated using the difference between $700,000 and the defendant's 2013 base pay of $298,686, and then

added to the base monthly amounts to determine his total child support and alimony obligation under the agreement. The plaintiff asks this court to remand the case to "the trial court to hold a new hearing on [her] motion for contempt, [at which] the court will interpret the parties' intent after consideration of all the extrinsic evidence and circumstances surrounding the entering of the agreement."

In response, the defendant contends that the Appellate Court correctly concluded that the agreement is clear and unambiguous with respect to his obligations to pay additional child support and alimony. He argues that the only way to interpret the sentence at issue in §§ 4.2 and 6.4 of the agreement, is that he "does not pay supplemental child support or alimony on 'gross earned income' in excess of $700,000 per calendar year." He further argues that "[i]t necessarily follows, pursuant to the plain language of the agreement establishing this cap, that, if [the defendant's] base pay (i.e., his monthly draw plus his quarterly tax payments) exceeds $700,000 annually, then he would not owe supplemental child support under § 4.2 or alimony under § 6.4—even if he receives bonus/profit sharing proceeds that same year," and, "[b]y contrast, if [his] base pay is less than $700,000, and he receives profit sharing distributions on top of his base pay, then the plaintiff is entitled to the [agreed on] portion of the profit sharing, up to a total gross earned income of $700,000." Relying on the Appellate Court's decisions in *Halperin* v. *Halperin*, 196 Conn. App. 603, 230 A.3d 757 (2020), *Wells* v. *Wells*, 196 Conn. App. 309, 229 A.3d 1194 (2020), and *Grogan* v. *Penza*, 194 Conn. App. 72, 220 A.3d 147 (2019), the defendant argues that the plaintiff's interpretation of §§ 4.2 and 6.4 incorrectly rewrites those provisions to "turn the $700,000 limitation on [his] annual gross income into a $700,000 limitation on [his] bonus." (Internal quotation marks omitted.) The defendant contends

that §§ 4.1 and 6.8 of the agreement provide the plaintiff's exclusive remedy for obtaining an increase in her child support and alimony, respectively, on the basis of any material increase in his earnings. Finally, the defendant argues that we should apply the doctrine of judicial estoppel to preclude the plaintiff's argument that the language of the agreement was ambiguous, insofar as she had argued before the trial court that it was clear and unambiguous in her favor, rendering it "inequitable" for her to change her position "only after she was told she was wrong by the Appellate Court . . . ."

"It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. . . . When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. . . .

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 191–92, 112 A.3d 144 (2015). The threshold question of whether contractual language is itself ambiguous is a question of law over which our review is plenary. See, e.g., *Remillard* v. *Remillard*, 297 Conn. 345, 355, 999 A.2d 713 (2010); *McTiernan* v. *McTiernan*, 164 Conn. App. 805, 824, 138 A.3d 935 (2016).

We begin with the relevant language of the agreement. In addition to the child support of $420 per week on the defendant's base draw income pursuant to § 4.1 of the agreement; see footnote 2 of this opinion; § 4.2 of the agreement governs the defendant's obligation to pay additional child support arising from his bonus or profit sharing. Section 4.2 provides: "From the [defendant's] anticipated bonus or profit sharing from his employment received on or after January 1, 2016, which he usually receives in January of each year, once the back taxes for 2012 and 2013 are paid in full as described in this [a]greement below, the [defendant] will pay to

the [plaintiff] 9 percent of his gross bonus/profit sharing so long as the [defendant] is obligated to pay child support for two children; and, the sum of the 6 percent of his gross bonus/profit sharing when there is only one minor child for whom the [defendant] is obligated to pay child support. *There will be no child support paid on the* [*defendant's*] *gross earned income in excess of $700,000 per calendar year. For the purposes of this paragraph, the bonus/profit sharing shall be considered as the total gross payment the* [*defendant*] *receives, less any portion that is part of his normal monthly draw and less any portion that is part of his normal quarterly tax payment draw he receives*." (Emphasis added.)

With respect to alimony, in addition to the $1750 monthly payment under § 6.3 of the agreement, § 6.4 of the agreement governs the defendant's obligation to pay additional alimony arising from his bonus or profit sharing. It provides: "Effective with his January 2016 bonus/profit sharing plan payment, the [defendant] shall pay to the [plaintiff] 20 percent of the [defendant's] gross bonus/profit sharing amount as additional alimony; *however, there will be no alimony paid on the* [*defendant's*] *gross earned income in excess of $700,000 per calendar year. For the purposes of this paragraph, the bonus/profit sharing shall be considered as the total gross payment the* [*defendant*] *receives, less any portion that is part of his normal monthly draw and less any portion that is part of his normal quarterly tax payment draw he receives*." (Emphasis added.)

Ultimately, the failure of the agreement to specify the mathematical order of operations to apply to the defendant's gross earned income complicates the task of interpreting its meaning. Standing alone, and given the apparent meaning of the term "gross earned income,"[16]

---

[16] The plain meaning of the term "gross earned income" unambiguously encompasses both the monthly draw and the bonus/profit sharing, with the order of operations lurking as an apparent latent ambiguity. See Merriam-

the defendant's reading of the sentence, "there will be no alimony [or child support] paid on the [defendant's] gross earned income in excess of $700,000 per calendar year," as eliminating his alimony and child support obligations should his bonus plus base draw income exceed $700,000, is reasonable. We do not, however, stop with this one sentence. This reading, which the Appellate Court adopted, runs afoul of the axiom that we do not read contractual provisions in isolation. See, e.g., *Nation-Bailey* v. *Bailey*, supra, 316 Conn. 194–95. Rather, we must give effect to all provisions of the agreement and eschew any reading that effectively nullifies or renders meaningless any one provision at the expense of another. Id., 195; see also *Parisi* v. *Parisi*, 315 Conn. 370, 384, 107 A.3d 930 (2015); *Fazio* v. *Fazio*, 162 Conn. App. 236, 248, 131 A.3d 1162, cert. denied, 320 Conn. 922, 132 A.3d 1095 (2016).

Reading the agreement as a whole, we agree with Judge Alvord that the plaintiff's reading of these provisions is also reasonable, rendering the agreement ambiguous. See *Simpson* v. *Simpson*, supra, 222 Conn. App. 498, 501 (*Alvord, J.*, concurring in part and dissenting in part). The plaintiff's reading accounts for the

---

Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary (last visited May 27, 2025) (defining "gross" to mean "consisting of an overall total exclusive of deductions," "earned" in relevant part as "to receive as return for effort and especially for work done or services rendered," and "income" in relevant part as "a gain or recurrent benefit usually measured in money that derives from capital or labor"); see also Black's Law Dictionary (6th Ed. 1990) p. 703 (defining "gross income" under § 61 (a) of Internal Revenue Code in relevant part as "all income from whatever source derived, including (but not limited to) the following items: (1) [c]ompensation for services, including fees, commissions and similar items . . . [and] (13) [d]istributive share of partnership gross income"). See generally *Nation-Bailey* v. *Bailey*, supra, 316 Conn. 193 ("[this court] often consult[s] dictionaries in interpreting contracts, including separation agreements, to determine whether the ordinary meanings of the words used therein are plain and unambiguous, or conversely, have varying definitions in common parlance" (internal quotation marks omitted)).

payment of child support and alimony on the base draw, and, after subtracting the designated base draw amount of $298,686 from $700,000 so as not to have the defendant pay child support and alimony twice on the same income, the provisions require payment of additional child support and alimony as a percentage on the remainder, which is a portion of the bonus, thus allowing the plaintiff to share in the defendant's higher earnings while simultaneously capping his overall obligation to pay additional child support and alimony at a negotiated amount of $700,000. As discussed during oral argument before this court, this would be consistent with the nature of the compensation the defendant receives as a law firm partner, with lower base draw amounts providing a regular paycheck that is supplemented by variable—and potentially much larger—bonus amounts reflecting the financial performance of the firm. With respect to alimony in particular, treating the additional alimony amount under § 6.4 of the agreement as separate from that payable under § 6.3 also effectuates those provisions of the agreement that render the additional alimony payable for a different term than the base alimony. Conversely, construing the agreement to have the plaintiff receive no additional support as the defendant's compensation increases is inconsistent with the purpose of §§ 4.2 and 6.4 of the agreement, which was to provide her with additional child support and alimony from the defendant's bonus or profit sharing.

Contrary to the defendant's contention, § 6.8 of the agreement does not resolve this ambiguity; if anything, it supports the plaintiff's interpretation. Its reference to the parties' $433,000 aggregate annual income at the time of the execution of the agreement, based on the plaintiff's salary and the defendant's "base draw or regular paychecks," may reasonably be read as supporting the trial court's decision to use the defendant's $298,686

base draw as a baseline number to offset against the $700,000 cap in all cases regardless of the bonus amount—thus giving effect to all of the provisions in the agreement. Instead, an increase in the $700,000 cap, which would result in higher support payments should the defendant's bonuses continue to rise beyond those initially contemplated by the agreement, would require renegotiation under § 6.8.[17]

Because both parties have set forth a plausible construction of the agreement's additional child support and alimony provisions, with both constructions having bases in the language used in the agreement, we conclude that the agreement is ambiguous, "with its meaning presenting a question of fact that the trial court should have fully considered and resolved." *Parisi* v. *Parisi*, supra, 315 Conn. 385. "It is elementary that neither this court nor the Appellate Court can find facts in the first instance. . . . [A]n appellate court cannot find facts or draw conclusions from primary facts found, but may only *review* such findings to see whether they might be legally, logically and reasonably found . . . ." (Emphasis in original; internal quotation marks omitted.) Id. Accordingly, this case must be remanded

---

[17] We disagree with the defendant's reliance on *Wells* v. *Wells*, supra, 196 Conn. App. 309, and *Grogan* v. *Penza*, supra, 194 Conn. App. 72. Neither of these cases concerned a separation agreement addressing the payment of alimony with language nearly as ambiguous as that in the present case. See *Wells* v. *Wells*, supra, 315–16 (separation agreement had definition of "annual income" that unambiguously included both bonus and remainder of defendant husband's gross income for purposes of tiered support calculation); *Grogan* v. *Penza*, supra, 81–83 (separation agreement clearly defined defendant husband's income from his law firm for purpose of calculating "true up" alimony solely by reference to line 1 of his schedule K-1 tax form, despite fact that his tax forms after he changed employment reported his income on different lines, rendering them not available as income at that point); cf. *Halperin* v. *Halperin*, supra, 196 Conn. App. 618–19 (relying on defendant wife's testimony to clarify meaning of phrase " 'historically been listed' " in conjunction with line 22 of Internal Revenue Service Form 1040 with respect to categories of income available for purposes of calculating plaintiff husband's support obligation under separation agreement).

to the trial court to resolve the ambiguity in the parties' agreement through a determination of their intent after consideration of all available extrinsic evidence and the circumstances surrounding the entering of the agreement. See id., 386; see also *Marshall* v. *Marshall*, 151 Conn. App. 638, 648, 97 A.3d 1 (2014) (remanding case to trial court for fact-finding to determine intent of parties and, accordingly, extent of arrearage, when court incorrectly deemed alimony provision in separation agreement to be unambiguous); cf. *Isham* v. *Isham*, 292 Conn. 170, 185, 972 A.2d 228 (2009) (trial court improperly excluded testimony from parties "with respect to their intent at the time of the formation of the agreement," given this court's conclusion that separation agreement was ambiguous as to meaning of term "salary"). This choice by the parties—*both* of whom argued that the agreement was clear and unambiguous in their favor—left the trial court to decide this case on the face of the agreement alone, despite that court's determination that it was ambiguous. This choice does not, however, preclude remand for factual findings in the first instance, when both parties will have the opportunity to introduce such extrinsic evidence to support their interpretation of the agreement.[18] See *Parisi* v. *Parisi*, supra, 385–86 (remanding case for consideration of all available extrinsic evidence as to intent after concluding that separation agreement was ambiguous, even though both parties claimed that it was plain and unambiguous); *McTiernan* v. *McTiernan*, 164 Conn. App. 805, 823 n.21, 831, 138 A.3d 935 (2016) (ordering

---

[18] Neither party is necessarily obligated to introduce such extrinsic evidence, and the parties' failure to do so affects only the extent to which they carry their burden of proof. See *Labieniec* v. *Megna*, 228 Conn. App. 127, 146 n.3, 324 A.3d 181 (2024); *Murchison* v. *Waterbury*, 218 Conn. App. 396, 415 n.19, 291 A.3d 1073 (2023). Indeed, in the absence of extrinsic evidence, a trial court must determine the meaning of the ambiguous provision from the text of the agreement itself. See, e.g., *Bijur* v. *Bijur*, 79 Conn. App. 752, 762–63, 831 A.2d 824 (2003).

remand for factual findings as to intent and noting that parties did not offer evidence of intent in crafting separation agreement provision at issue, which trial court found to be unambiguous, during evidentiary hearing on motion for contempt).

In this regard, we disagree with the defendant's argument that the plaintiff's evidentiary and legal strategy at trial operates to judicially estop a remand for a factual determination of the parties' intent. "[J]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding. . . . [J]udicial estoppel serves interests different from those served by equitable estoppel, which is designed to ensure fairness in the relationship between parties. . . . The courts invoke judicial estoppel as a means to preserve the sanctity of the oath or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings. . . .

"Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. . . . We further limit judicial estoppel to situations [in which] the risk of inconsistent results with its impact on judicial integrity is certain. . . . Thus, courts generally will not apply the doctrine if the first statement or omission was the result of a good faith mistake . . . or an unintentional error." (Citations omitted; internal quotation marks omitted.) *Dougan* v. *Dougan*, 301 Conn. 361, 372–73, 21 A.3d 791 (2011); see also *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 169–70, 2 A.3d 873 (2010). The doctrine of judicial estoppel has been described as "protect[ing] the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the

moment . . . ." (Citations omitted; internal quotation marks omitted.) *New Hampshire* v. *Maine*, 532 U.S. 742, 749–50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001). Whether to invoke the doctrine is a matter of equity reserved to the court's discretion. Id., 750.

The defendant's attempt to invoke the doctrine of judicial estoppel to preclude a remand in this case founders on all three elements of that doctrine, particularly given the absence of any evidence of bad faith on the part of the plaintiff. See *Assn. Resources, Inc.* v. *Wall*, supra, 298 Conn. 171–72. First, arguing that an agreement is clear and unambiguous is not a position that is "clearly inconsistent" with arguing that it is ambiguous, when the overall meaning urged by the arguing party remains the same. *Dougan* v. *Dougan*, supra, 301 Conn. 372; cf. *Barton* v. *Norwalk*, 326 Conn. 139, 159, 161 A.3d 1264 (2017) (doctrine of judicial estoppel did not preclude claim in inverse condemnation action that plaintiff would have used his land as parking lot, even though he sought its valuation as mixed-use development in earlier eminent domain action); *Dougan* v. *Dougan*, supra, 374 (doctrine of judicial estoppel applied to plaintiff husband's claim that separation agreement was impermissible "penalty [that] was unenforceable as against public policy" when brought "[a]pproximately one year after [his] representing to the trial court that he was aware of, understood and agreed to the stipulated agreement in its entirety, and that the agreement was fair and equitable," given that he was sophisticated party who was represented by counsel during negotiations). Second, the trial court did not rely on the plaintiff's position that the agreement was unambiguous; indeed, it concluded the opposite, holding as a matter of law that the agreement was ambiguous. See *New Hampshire* v. *Maine*, supra, 532 U.S. 750; *Bongiorno* v. *J & G Realty, LLC*, 162 Conn. App. 430, 440–41, 131 A.3d 1230, cert. denied, 320 Conn.

924, 133 A.3d 878 (2016). Finally, there is no unfair advantage to the plaintiff, and the defendant was not and will not be prejudiced by any inconsistency; see *New Hampshire* v. *Maine*, supra, 751; as he could have sought to introduce any extrinsic evidence that would have supported his interpretation of the agreement during the lengthy hearing on these motions and will have the opportunity to do so on remand.

The judgment of the Appellate Court is reversed insofar as that court determined that the relevant provisions of the parties' separation agreement pertaining to child support and alimony were clear and unambiguous, and the case is remanded to that court with direction to reverse the trial court's ruling on the plaintiff's motion for contempt as it related to the trial court's remedial orders, to reverse the trial court's ruling on the plaintiff's motion for modification of child support and alimony, and to remand the case to the trial court for further proceedings in accordance with this opinion; the judgment of the Appellate Court is affirmed as to its decision concerning the trial court's award of attorney's fees and the trial court's ruling on the plaintiff's motion for an order regarding college expenses, as to its remand order relating to these matters, and with respect to the Appellate Court's affirmance of the trial court's rulings in all other respects.

In this opinion the other justices concurred.